## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SEAHORN INVESTMENTS, LLC** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **CIVIL NO. 1:13CV320-HSO-RHW** |
| | § | |
| **FEDERAL INSURANCE COMPANY,** | § | **DEFENDANTS** |
| **MISSISSIPPI FARM BUREAU** | § | |
| **CASUALTY INSURANCE** | § | |
| **COMPANY, MAXUM INDEMNITY** | § | |
| **COMPANY, STEADFAST** | § | |
| **INSURANCE COMPANY, ALTERRA** | § | |
| **EXCESS & SURPLUS INSURANCE** | § | |
| **COMPANY** | § | |

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO EXCLUDE TESTIMONY OF FRANK STUART [217], GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE TESTIMONY OF MICHAEL GURTLER [215], AND GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE TESTIMONY OF RICHARD LYON [219]

BEFORE THE COURT are the Motion to Exclude Testimony of Michael Gurtler [215], the Motion to Exclude Testimony of Frank Stuart [217], and the Motion to Exclude Testimony of Richard Lyon [219], filed by Defendants Alterra Excess & Surplus Insurance Company, Federal Insurance Company, Maxum Indemnity Company, Mississippi Farm Bureau Casualty Insurance Company, and Steadfast Insurance Company.[1] These Motions are fully briefed. Having considered the parties' submissions, the record, relevant legal authorities, and the record of the hearing held on August 31, 2015, the Court is of the opinion the Motion to Exclude

---

[1] As of the date of this Memorandum Opinion and Order, Plaintiff has settled its claims against Defendants Alterra Excess & Surplus Insurance Company, Federal Insurance Company, Maxum Indemnity Company, and Steadfast Insurance Company, and these Motions [215] [217] [219] remain pending only as to Mississippi Farm Bureau Casualty Insurance Company.

Testimony of Frank Stuart [217] should be granted, the Motion to Exclude Testimony of Michael Gurtler [215] should be granted in part and denied in part, and the Motion to Exclude Testimony of Richard Lyon [219] should be granted in part and denied in part.

## I. BACKGROUND

Plaintiff Seahorn Investments, LLC ("Seahorn"), owns Waverly Apartments, which is a residential apartment community consisting of 16 separate residential apartment buildings located at 100 Waverly Place, Bay St. Louis, Mississippi. Compl. ¶¶ 3-4 [1].  Prior to August 29, 2012, Seahorn procured flood insurance through Defendant Mississippi Farm Bureau Casualty Insurance Company ("Mississippi Farm Bureau").  Compl. ¶ 5 [1].  Seahorn also secured a "Master Primary Policy" with Defendant Federal Insurance Company insuring Seahorn against "all risks of physical damage[,]" including flood damages.  Compl. ¶ 6 [1]. Seahorn additionally obtained policies providing excess insurance coverage from Defendants Alterra Excess & Surplus Insurance Company ("Alterra"), Maxum Indemnity Company ("Maxum"), and Steadfast Insurance Company ("Steadfast").[2] Compl. ¶¶ 7-9 [1].

According to the Complaint [1], on August 29, 2012, Hurricane Isaac made landfall in the State of Louisiana, and as the storm passed over land, it caused severe flooding throughout Bay St. Louis, Mississippi, including at Waverly

---

[2] At times, the Court will refer to Mississippi Farm Bureau, Federal, Alterra, Maxum, and Steadfast collectively as "Defendants."

Apartments.  Compl. ¶ 11 [1].  Seahorn claims that as a result of "flooding and associated damages caused by Hurricane Isaac[,]" the floor joists and sub-floor of each of the 16 residential apartment buildings at Waverly Apartments have been so damaged as to constitute a total loss.  *Id*. at ¶ 13.  Seahorn also contends that a City of Bay St. Louis ordinance requires that each of the 16 structures at Waverly Apartments be raised to comply with the City's current Base Flood Elevation levels.  *Id*. at ¶¶ 15-16.  After unsuccessfully seeking insurance coverage from Defendants, Seahorn filed the Complaint in this case on August 7, 2013, asserting claims for breach of contract and extracontractual damages based on Defendants' alleged refusal to tender all amounts due under each policy.  *Id*. at ¶ 32.

A.    Plaintiff's Expert Frank Stuart, P.E.

At some point in the months immediately following Hurricane Isaac's landfall on August 29, 2012, but prior to the Complaint [1] being filed on August 7, 2013, one of Seahorn's co-owners, Mike Seago ("Seago"), contacted Mr. Frank Stuart ("Stuart"), President of Stuart Consulting Group ("SCG"), and asked Stuart to come to Waverly Apartments and assess the damages caused by Hurricane Isaac.  Dep. of Frank Stuart ("Stuart Dep.") 13:16-23 [217-7]; *see also* Ex. 5 to Mot. to Exclude Test. of Frank Stuart [217-5].  Stuart and Joseph Rickett ("Rickett"), an engineer employed by SCG, attended the meeting with Seago.  Stuart Dep. 14:6-11 [217-7].

At that meeting, Seago asked Stuart and Rickett to determine if each of the residential apartment buildings at Waverly Apartments were sound and to identify

the cause of the "differential settlement . . . in each of the buildings."[3]  *Id.* at 15:20-

25.  At this first meeting, Stuart observed what appeared to him to be differential

settlement on the first floor units and, upon entering the crawl space beneath "three

or four buildings," Stuart noticed "deflections" in some of the trusses in the crawl

space.  *Id.* at 15:18-16:10, 65:14-66:6, 187:14-18, 189:2-5.  Stuart believed that the

deflected trusses were a potential cause of the differential settlement in the first

floor units he observed.  *Id.* at 15:18-16:10, 65:14-66:6, 187:14-18, 189:2-5.

According to Stuart, he "made the determination very early on" that the problems

with the buildings at Waverly Apartments "had to be something . . . from the

subfloor down."  *Id.* at 53:3-19.  After the meeting concluded, Stuart and Rickett

returned to the SCG offices, and while driving back, Stuart "explained to [Rickett]

what [Stuart] wanted [Rickett] to do[,]" Rickett "told [Stuart] what [Rickett]

thought needed to be done[,]" and the pair "made a course of action."  *Id.* at 18:7-13.[4]

On December 19, 2012, Rickett went to Waverly Apartments and measured

---

[3] Stuart described "differential settlement" as occurring when "different points [of a slab] are settling at . . . different rates."  Stuart Dep. 16:12-25 [217-7].  Although he referred to "a slab," Stuart clarified that the differential settlement he believed was occurring at Waverly Apartments was occurring "above the foundation, but below the sub-floor" and further noted that "all the settlement we're talking about is occurring in the joists themselves, not the sub-floor and not below."  *Id.* at 16:24-25, 17:4-6.

[4] Stuart recalled returning to Waverly Apartments "probably some months after that initial meeting" when he "went back to look at some of the issues that [Rickett] had found on the floor joists so [Stuart] could verify what [Rickett] was telling [him]."  Stuart Dep. 18:14-19:3 [217-7].  Stuart did not elaborate on how he verified the information Rickett was telling him, and other than this return trip, Stuart could not recall returning to Waverly Apartments any other time.  *Id.* at 19:1-3.

the deflection in joists beneath the apartment buildings.[5]  *Id*. at 189:2-13; 47:4-19.

Rickett obtained measurement readings using a micrometer which Stuart stated

did "not work[] out very well" because the micrometer did not produce accurate

readings.  *Id*. at 46:7-47:19; Original Report dated Feb. 7, 2013 [217-1] ("Original

Report").  Stuart does not know whether Rickett took any photos during this

inspection.  Stuart Dep. 67:25-68:3 [217-7].

 After the inspection, Rickett prepared the February 7, 2013, Original Report,

which was later submitted in these proceedings as Stuart's original expert report.

*Id*. at 29:13-19.  The Original Report included a table from the readings Rickett

obtained.  *Id*. at 46:7-47:8.  Stuart stated that Rickett "did all the technical work"

underlying the Original Report.  *Id*. at 28:7-12.  After the Original Report was

drafted by Rickett, the Original Report "c[ame] to [Stuart], and then [Stuart] ma[de]

whatever changes, discuss[ed] with [Rickett] why [Rickett] said what he said. . . .

[Stuart and Rickett went] through [the Original Report]. . . . [Rickett] ma[de]

whatever changes that [Stuart] want[ed] in it, and then, . . . we issue[d] it."  *Id*. at

25:22-26:6; 29:13-25.  Stuart was unaware of whether Rickett made any

assumptions regarding the City of Bay St. Louis' inspection of Waverly Apartments

prior to issuing a certificate of occupancy after Hurricane Katrina.  *Id*. at 32:21-

---

[5] There is insufficient evidence in the record to indicate whether Stuart accompanied Rickett to the Waverly Apartments for the December 19, 2012, inspection.  *Compare* Stuart Dep. 67:6-10 [217-7] (responding in the affirmative when asked if he was present at the December 19, 2012, inspection), *with* Stuart Dep. 101:25-102:3 [217-7] (stating that he did not know if he was present at the December 19, 2012, inspection), *and* Stuart Dep. 189:2-13 [217-7] (indicating Stuart did not accompany Rickett on the December 19, 2012, inspection).

33:4.  Stuart agreed that he acted in the role of a "peer reviewer" with respect to the

Original Report.  *Id*. at 26:7-12.  According to Stuart, the Original Report was

merely intended to identify a problem as opposed to a cause of that problem:

> Q.    Do you think this first report, just your visual, complies with
>       reliable engineering standards?
> A.    When this report was put together, it was to tell him what we saw,
>       what we observed and what the problem was. It was not in any
>       attempt [sic] to go beyond that.

*Id*. at 191:23-192:4.

Nevertheless, the Original Report was produced by Seahorn to Defendants on

May 16, 2014, as the Rule 26(a)(2)(B) report of Seahorn's expert designated for

establishing causation with respect to "structural damages . . . to the truss systems

of the buildings at the Waverly Apartments . . . sustained from Hurricane Isaac."

Pl.'s Rule 26(a)(2) Initial Expert Disclosures 2 [215-2]; Notice of Service of Pl.'s

Initial Expert Disclosures Pursuant to Rule 26(a)(2) [72].  Despite the fact that

Rickett prepared the Original Report based on his own observations and readings,

that Stuart merely acted as the "peer reviewer" of the Original Report, and that

Stuart had not verified information in the Original Report, Stuart signed the

Original Report as its author.  Original Report 3 [217-1].  Although listed in the

Original Report as information he reviewed, Stuart acknowledged in his deposition

that he did not review correspondence from the Bay St. Louis building inspector,

building permits from the City of Bay St. Louis, or email correspondence regarding

costs of repairs to Waverly Apartments.  Stuart Dep. 34:11-22; 34:23-35:1, 35:5-14

[217-7].  The Original Report noted that "damage from Hurricane Katrina was

6

documented to be between 38.3% and 46.9% of the value of the units" and reasoned that "the significant repairs necessary to the support systems due to Hurricane Isaac damage will exceed the 50% threshold in Bay St. Louis [O]rdinance 521." Original Report 3 [217-1].  However, Stuart later admitted that he did not know where Rickett obtained the percentages that he attributed to Hurricane Katrina damages, and he simply assumed without verifying that Rickett was correct in claiming that Bay St. Louis Ordinance 521 would be triggered.  Stuart Dep. 106:7-108:8 [217-7].

On February 19, 2015, Seahorn produced a Supplement to the Expert Report of Frank M. Stuart [217-2] ("Supplemental Report"), which was dated February 6, 2015.  Notice of Service [190].  The Supplemental Report was based on an inspection of six randomly selected trusses in each of the buildings at Waverly Apartments, with the exception of Building Eight, in which 12 trusses were randomly selected.  Stuart Dep. 54:23-55:5; 63:21-64:3 [217-7].  This inspection was performed by Rickett and Chris Blazo ("Blazo"), another employee of SCG, on December 12, 2014, and December 16, 2014.  *Id.* at 59:15-18.  According to Stuart, Rickett and Blazo were sent back to Waverly Apartments because Rickett had contacted the engineer who originally designed the trusses and received information related to the "allowables . . . on the trusses for deformation[,]" and Stuart wanted to "make sure that we really do have a problem or we really do[ not] have a problem."  *Id.* at 59:19-60:8; 62:8-63:10.  For each truss inspected, Rickett and Blazo used a laser at the bottom chord where the support for each truss is located and

"shot" the laser down the truss and measured at points to determine whether each truss exhibited deflection. *Id.* at 64:4-9. Stuart was not present on either December 12 or December 16 when these inspections were performed. *Id.* at 64:20-22. Rickett prepared a chart of observations made after this inspection, and the chart is included in the Supplemental Report. *See* Suppl. Report 3-6 [217-2]. Stuart's involvement with the Supplemental Report was to read through the report, meet with Rickett and Blazo, discuss the findings, and make "a few corrections . . . ." Stuart Dep. 64:23-65:5 [217-7]. Stuart acknowledges that the "actual engineering work" related to the Supplemental Report was performed by Rickett. *Id.* at 65:6-8.

Stuart discussed the reasoning behind SCG's decision to only test 15 percent of the trusses at Waverly Apartments during the December 2014 inspection. *See id.* at 177:1-181:7. Rickett randomly selected six trusses from each building except for Building Eight, at which 12 trusses were selected. *Id.* at 178:3-5. Once Rickett randomly selected six trusses in Building One, he tested those same randomly selected trusses on each of the other 15 buildings, with the exception of Building Eight. *Id.* at 178:6-11. SCG did not "do anything to weed out trusses that had [prior] repairs made to them[,]" and Stuart acknowledged that some of the trusses that previously underwent repairs were not successfully repaired. *Id.* at 183:11-184:18. According to Stuart, randomly selecting six trusses in each building "was as good as any" a method "to validate whether" the trusses in the floor framing systems of each building "were bad or good." *Id.* at 178:23-179:3. When asked what

would constitute "a meaningful sample size to test the floor framing system" of each building, Stuart testified "[t]hat depends on what you[ are] after. We were not after a statistical percentage of these, nor were we trying to find statistically something that yielded a 99.5 or whatever percentage of accuracy.  We simply wanted to see whether the theory held out over these." *Id*. at 179:4-11.  Stuart did not know what a "meaningful percentage" of trusses would be, and explained that SCG "did not go after anything that was statistically accurate in this endeavor.  We went after something merely to see whether the theory held, and it did." *Id*. at 180:14-18.  Stuart believes that SCG's sample of 15 percent of the trusses under each of the buildings "definitively supports" his conclusion that the deflection in the trusses was caused by Hurricane Isaac.  *Id*. at 181:5-7.

Defendants, including Mississippi Farm Bureau, filed their Motion to Exclude Testimony of Frank Stuart [217] on April 30, 2015, asserting that the Report was impermissibly "ghostwritten" by Rickett, and that Stuart is not aware of the extent of the data upon which Rickett relied or how much significance Rickett placed on various data.  Mem. in Supp. of Mot. to Exclude Test. of Frank Stuart 9-12 [218].  Mississippi Farm Bureau also contends that the Report is based on incorrect assumptions, unreliable information, and inaccurate calculations.  *Id*. at 4-5, 12-14.  According to Mississippi Farm Bureau, Stuart applies *post hoc ergo proper hoc* reasoning to reach his conclusions.  *Id*. at 14-18.  Plaintiff responds that Stuart actively participated in directing the investigation underlying the Original

Report and Supplemental Report and in the preparation of both Reports. Mem. in Opp'n to Mot. to Exclude Test. of Frank Stuart 1-8 [248]. Plaintiff maintains that the facts and data upon which Stuart relied, including the statistical sampling of trusses, were reliable, and that Stuart did not apply *post hoc ergo proper hoc* reasoning because Stuart "identified the potential causes for the Waverly damages[,] systematically examined" those potential causes, "and ruled them out." *Id.* at 12-18.

B.   Plaintiff's Expert Michael Gurtler

On May 16, 2014, Seahorn identified Michael Gurtler ("Gurter") as an expert in the area of construction "who will opine regarding the flood damages at the Waverly Apartments caused by Hurricane Isaac." *See* Initial Rule 26(a)(2) Expert Disclosures 1 [215-2]; *see also* Mem. in Supp. of Opp'n to Mot. to Exclude Test. of Michael Gurtler 8 n.27 [254]. Gurtler prepared a report dated February 22, 2013, which summarized "numerous inspections of [Waverly Apartments] between August 29, 2012[,]" and February 22, 2013. Feb. 22, 2013, Report of Gurtler [215-3, 9 of 341]. As early as September 2, 2010, Gurtler had inspected the residential buildings at Waverly Apartments and investigated moisture problems related to the buildings. *See id.*; *see generally* Sept. 8, 2010, Gurtler Report [215-8].

Shortly after Hurricane Isaac's August 29, 2012, landfall, Gurtler returned to the Waverly Apartments on September 6, 2012, to "conduct[ an] inspection specifically to determine what wind damages occurred at [Waverly Apartments] during Hurricane Isaac." Sept. 16, 2012, Gurtler Report [215-3, 71 of 341]. Gurtler

10

also conducted an inspection to evaluate the findings of Seahorn's "flood insurance adjuster," and concluded from this inspection that "[f]lood waters entered all crawl spaces and saturated the under floor framing systems[, s]ome of these framing systems have failed[,] and water intrusion resulted in damage to bamboo and ceramic flooring in some of the residential buildings." Sept. 11, 2012, Gurtler Report [215-4, 136-94 of 257].

Gurtler returned again on September 8, 2012, and performed a moisture analysis by way of a thermal scan of the interior of the residential buildings one through nine, which purportedly revealed that Waverly Apartments "incurred significant moisture penetration and damages on the first and second floors, as a result of Hurricane Isaac." Sept. 13, 2012, Gurtler Report [215-3, 147-49 of 341]. Gurtler performed a similar moisture analysis on residential buildings ten through sixteen on September 14, 2012, and reported that the "inspection revealed numerous leaks throughout" the residential buildings, which incurred "significant moisture penetration and damages on the first and second floors, as a result of Hurricane Isaac." Sept. 18, 2012, Gurtler Report [215-4, 59-135 of 257]. Gurtler also appears to have prepared a September 24, 2012, report detailing "supplementary on-site observations regarding flood damages" which contained numerous pictures purporting to depict the uneven flooring in the residential buildings and captioned with, among other information, the statement that "[t]he floor framing system failed as a direct result of flood damage." *See generally* Sept. 24, 2012, Gurtler Report [215-4, 1-56 of 257].

When he inspected the Waverly Apartments, Gurtler "did not do anything under the [residential buildings at Waverly Apartments] to measure floor truss deflection[,]" and Gurtler's observation of deflection in the trusses was limited to what he visually observed and felt as he walked through the residential buildings. Dep. of Michael Gurtler ("Gurtler Dep.") 225:6-10; 223:8-21 [215-5]. Gurtler relied entirely on Stuart to measure deflection in the trusses beneath the residential buildings. *Id.* at 223:23-224:17. In fact, Gurtler acknowledged that the determination of the impact that flooding may have caused to the trusses was not his area of expertise. *Id.* at 302:10-13. Nevertheless, Gurtler attributes truss deflection as the cause of damages at the Waverly Apartments based on Stuart's reports and Gurtler's visual inspection of the interior of the residential units. *Id.* at 296:10-297:4.

Seahorn notes that Gurtler is being offered as an expert in the area of construction and has the following six opinions: (1) Mississippi Farm Bureau's claim adjuster performed an inadequate inspection of flood damages to the 16 residential buildings at Waverly Apartments which prevented the adjuster from discovering damage to the floor framing system; (2) because the floor truss system beneath each of the 16 residential buildings at Waverly Apartments failed due to deflection of the floor trusses outside of the allowed tolerances, the entire floor system will require replacement; (3) the repairs to the floor truss system will require jacking of each of the buildings; (4) the cost of performing the repairs necessitated by the failure of the floor truss system is $5,883,261.00; (5) City of Bay St. Louis Ordinance 521 applies

12

and requires the demolition and reconstruction of all 16 residential buildings at Waverly Apartments; and (6) the project will cost approximately $25,000,000.00. *See* Mem. in Supp. of Opp'n to Mot. to Exclude Test. of Michael Gurtler 8 [254].

Defendants collectively filed their Motion to Exclude Testimony of Michael Gurtler [215] on April 30, 2015. Mississippi Farm Bureau asserts that Gurtler's "opinions regarding the cause of floor [truss] deflection and interior floor damage are not based upon 'sufficient facts or data' and are not the product of 'reliable principles or methods.'" Mem. in Supp. of Mot. to Exclude Test. of Michael Gurtler 6-7 [216]. According to Mississippi Farm Bureau, Gurtler's causation opinions rely on the fallacy of *post hoc ergo propter hoc*, the discredited investigation and opinion of Stuart, and Gurtler's own *ipse dixit*. *Id*. at 7-12. Mississippi Farm Bureau further contends that the methodology underlying Gurtler's damages estimate opinions is unhelpful, misleading, and unreliable. *Id*. at 12-16.

C.   Plaintiff's Expert Richard Lyon

On May 16, 2015, Seahorn designated Richard Lyon ("Lyon"), a public adjuster, as "a construction and insurance restoration expert who will opine regarding the scope of damages at the Waverly Apartments caused by Hurricane Isaac." Initial Rule 26(a)(2) Expert Disclosures 1 [215-2]. Gurtler, in addition to inspecting the residential buildings at Waverly Apartments, supplied Lyon with information regarding the scope of damages Gurtler claimed to observe at the apartments so that Lyon could generate an estimate of Seahorn's damages. Gurtler Dep. 38:15-39:11 [215-5]. According to Gurtler, he did not hire Lyon as a public

13

adjuster but rather as an "estimator," and this distinction meant that Lyon was retained by Gurtler to receive damages information from Gurtler and prepare a damages estimate based only on the information provided by Gurtler. *Id.* at 39:12-17; Dep. of Richard Lyon ("Lyon Dep.") 72:3-25 [219-3]. Lyon confirmed that he did not "make any decisions at all as to what needed to be replaced and what did not need to be replaced[,]" and that he "was simply asked to estimate the damages as dictated by Michael Gurtler." Lyon Dep. 72:19-73:7 [219-3]. Gurtler supplied Lyon with the information in each of Gurtler's reports, had Lyon "take dimensions" on the property at Waverly Apartments, and "generate an estimate for repairs." Gurtler Dep. 39:23-40:8 [215-5]. In preparing an estimate for repairs to the interior flooring, Gurtler acknowledges that he instructed Lyon to "gut everything four feet up." *Id.* at 40:9-41:12. Gurtler explained that he based this determination on his opinion that the flooring needed to be replaced, which necessitated damages to the interior and exterior walls as the flooring was removed from beneath those walls. *Id.* Gurtler admitted that he made no determination as to whether the Standard Flood Insurance Policy would cover such repairs. *Id.* at 41:13-17.

Defendants collectively filed a Motion to Exclude Testimony of Richard Lyon [219], seeking Lyon's exclusion on grounds that his opinions are unreliable and not the subject of any "expert adjusting work." Mem. in Supp of Mot. to Exclude Test. of Richard Lyon 6 [220]. Mississippi Farm Bureau contends that Lyon's opinions are unreliable and irrelevant because he has no knowledge of the accuracy of the data underlying his opinions. *Id.* at 7. Mississippi Farm Bureau concludes that

Lyon's proffered expert testimony should be excluded because Lyon "did not do any expert work" and simply input Gurtler's damage assessments "into a software program." *Id.* at 8-9.

## II. <u>DISCUSSION</u>

A.   <u>Legal Standard</u>

"Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court . . . ." Fed. R. Evid. 104(a).  "Before certifying an expert and admitting his testimony, a district court must ensure that the requirements of Federal Rule of Evidence 702 have been met." *Roman v. Western Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (citations omitted).  "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the Rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002) (citing *Bourjaily v. United States*, 483 U.S. 171, 173 (1987)).  Rule 702 provides

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court functions as a gatekeeper to ensure that an expert is properly qualified and that his testimony is both reliable and relevant. *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (relying on *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590-93 (1993)); *see United States v. McMillan*, 600 F.3d 434, 456 (5th Cir. 2010); *see also Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (citation omitted).   Expert testimony is relevant when it relates to any issue in the case. *Daubert*, 509 U.S. at 591.   Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592-93.

"[T]he proponent of expert testimony . . . has the burden of showing that the testimony is reliable[] . . . and must establish the admissibility requirements by a preponderance of the evidence . . . ." *Previto v. Ryobi N. Am., Inc.*, 766 F. Supp. 2d 759, 765 (S.D. Miss. 2010) (citations and internal marks omitted).   An expert opinion is deemed reliable if it is based upon sufficient facts and data, and it is the product of reliable principles and methods.   Fed. R. Evid. 702(b) and (c).   Otherwise, it constitutes "'unsupported speculation or subjective belief.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (quoting *Daubert*, 509 U.S. at 590).   "The court should 'make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006) (quoting

16

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).  *Daubert* "provides

an illustrative list of factors that may aid a court in evaluating reliability."  *Mathis*,

302 F.3d at 460.  These factors include

> (1) whether the theory or technique has been tested; (2) whether the
> theory or technique has been subjected to peer review and publication; (3)
> the known or potential rate of error of the method used and the existence
> and maintenance of standards controlling the technique's operation; and
> (4) whether the theory or method has been generally accepted in the
> scientific community.

*Kumho*, 526 U.S. at 149-50 (citing *Daubert*, 509 U.S. at 592-94).  "These factors are

not mandatory or exclusive; the district court must decide whether the factors

discussed in *Daubert* are appropriate, use them as a starting point, and then

ascertain if other factors should be considered."  *Hathaway v. Bazany*, 507 F.3d 312,

318 (5th Cir. 2007).  "But the existence of sufficient facts and a reliable methodology

is in all instances mandatory."  *Id*.  "[W]ithout more than credentials and a

subjective opinion, an expert's testimony that 'it is so' is not admissible."  *Previto*,

766 F. Supp. 2d at 771 (quoting *Hathaway*, 507 F.3d at 318 (internal marks

omitted)).

 In addition to mandating the disclosure of the identities of witnesses a party

may use to present expert testimony, Federal Rule of Civil Procedure 26(a) requires

that

> this disclosure must be accompanied by a written report--prepared and
> signed by the witness--if the witness is one retained or specially employed
> to provide expert testimony in the case . . . . The report must contain:
>> (i) a complete statement of all opinions the witness will express
>> and the basis and reasons for them;

(ii)    the facts or data considered by the witness in forming them;

(iii)   any exhibits that will be used to summarize or support them;

(iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)   a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). "The purpose of supplementary disclosures is just that   to supplement.  Such disclosures are not intended to provide an extension of the expert designation and report production deadline." *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998).

B.    <u>Stuart Should Be Excluded From Testifying</u>

    1.   <u>Seahorn's Rule 26(a) Expert Disclosure of Stuart was Insufficient</u>

The Court finds that neither Stuart's Original Report nor the Supplemental Report comply with expert disclosure requirements set forth in Rule 26(a)(2)(B).  As a threshold matter, the record supports the conclusion that the Original Report, notwithstanding the fact that Stuart signed it as his own, was "ghost written" by Rickett.  "Ghost writing a testifying expert's report is the preparation of the substance writing of the report by someone other than the expert purporting to have written it." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 291 (E.D. Va. 2001). "To prove ghost writing, [Mississippi Farm Bureau] must use the available documents to show that [Rickett] provided the substance of the opinions of the testifying expert[, Stuart], not just editorial assistance." *Id.* at 295.

18

Seahorn relies upon *Estate of Lafarge ex rel. Blizzard v. Kyker*, No. 1:08cv185, 2011 WL 6151595, at *6 (N.D. Miss. Dec. 12, 2011), to contend that Mississippi Farm Bureau has not met its burden on this issue.  The pertinent facts in *Estate of Lafarge*, however, are distinguishable in that the attorney who had retained the expert and allegedly drafted the expert's report had instead merely provided to the expert, for the expert's review and signature, an amended version of text which the expert had earlier submitted to the attorney.  2011 WL 6151595, at *7.  In finding that the expert's report was not "ghost written" by the attorney, the United States District Court for the Northern District of Mississippi relied in part on the Advisory Committee Note pertaining to Rule 26, which provides that "Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports . . . . Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness . . . ." *Id.*

Here, the record makes clear that Rickett not only prepared the draft of the Original Report for Stuart's review and edit, but there is no dispute that Rickett provided the actual substantive content and engineering calculations central to the conclusions in the Original Report.  *See* Stuart Dep. 25:22-26:6, 28:7-12, 29:13-25 [217-7] (Original Report).  Unlike the facts in *Estate of Lafarge*, this is not a case of an attorney providing editing assistance to a retained expert.[6]  Nor is this a case

_____

[6] While the parties have not addressed the precise question of what impact, if any, Rickett's signature on the Supplemental Report would have on the "ghost writing" issue, the Court is of the

where the report "set[s] forth the substance of the [expert's] direct examination" or where the report has been "written in a manner that reflects the testimony to be given by the witness . . . ."  Rule 26, Advisory Committee Notes; *see also* Stuart Dep. 72:17-73:3, 78:24-79:7, 80:3-19, 93:16-94:8, 106:7-18, 107:12-108:8, 110:11-19, 132:4-8, 172:17-176:6 [217-7].  If anything, the record reveals that it was actually Stuart, the disclosed expert, who provided editorial assistance to Rickett, the undisclosed structural engineer, who prepared and wrote the Original Report. Stuart Dep. 25:22-26:6; 26:7-12; 29:13-25 [217-7].  The fact that Stuart's Original Report was ghost written by Rickett militates in favor of finding that the Original Report did not comply with the disclosure requirements of Rule 26(a)(2)(B).

By his own testimony, Stuart acknowledges that the Original Report was incomplete and lacking in critical detail and thus contravened the requirements of Rule 26(a).  Rule 26(a) mandates that initial disclosures of expert reports be "complete and detailed."  *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996).  Insofar as Stuart seeks to offer expert opinion as to the cause of the deflection in trusses at Waverly Apartments, Stuart's own testimony makes clear that the Original Report was incomplete in this crucial regard.  According to Stuart, when the Original Report "was put together, it was to tell [Seahorn] what we saw, what we observed and what the problem was[; i]t was not . . . any attempt to go beyond that."  Stuart Dep. 1991:23-192:4 [217-7].  Stuart

---

view it would not alter the outcome here because Seahorn never properly disclosed or designated Rickett as either a testifying or non-testifying expert.  *See* Pl.'s Initial Expert Disclosures [72].

added that the reason he sent Rickett back to the Waverly Apartments to conduct the investigation made the basis of the Supplemental Report was to use laser measurements to obtain "an accurate depiction" of the deflection previously observed. *Id.* at 193:6-194:3. Thus, the Original Report cannot be viewed as offering anything beyond speculation and conjecture on the issue of causation. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999) (finding that where an expert explained that she did not "find the cause" of the plaintiff's fibromyalgia but rather that she "found an event that contributed to the development of the symptom[,]" the expert's opinion as to causation "[o]n its own terms . . . includes conjecture"). Consequently, the Original Report was incomplete and lacked sufficient detail to serve the purposes for which it was intended, making it insufficient under Rule 26(a)(2).

Seahorn's reliance on the Supplemental Report to cure this insufficiency is unavailing. Supplemental disclosures "are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert information." *Cedar Point Oil*, 73 F.3d at 571. The Supplemental Report was disclosed on February 19, 2015, after the expert deadline had passed in this case, and only four weeks before the April 15, 2015, discovery deadline. The record makes evident that Stuart's Supplemental Report contains the "lion's share" of his expert testimony related to the deflection present in trusses at Waverly Apartments. Stuart even testified that the methodology underlying the measurements detailed in the Supplemental Report renders the Supplemental

Report "lots more accurate" and makes the Supplemental Report the report which "we would stand behind" while the Original Report "was merely an attempt to see what we had."  Stuart Dep. 194:11-18; 195:7-12 [217-7].  Although the Supplemental Report provides more specific information regarding the deflection observed by Rickett, this information undoubtedly should have been produced at the time Seahorn's initial expert disclosures under Rule 26(a) were due, and certainly by the original expert designation deadline.  Therefore, the information provided in the Supplemental Report was not properly disclosed and violates the disclosure requirements of Rule 26.  *U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*, No. 3:06-cv-1792-O, 2010 WL 8367619, at *3 (N.D. Tex. Oct. 8, 2010) (declining to consider supplemental report of proffered expert on opposing party's motion to exclude the expert where it was apparent that the "lion's share" of expert's testimony was offered in the supplemental disclosure).

The facts underlying the Original Report further illuminate its insufficient nature.  "An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify."  *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) (citing *United States v. Bramlet*, 820 F.2d 851, 855-56 (7th Cir. 1987)).  The "[a]nalysis becomes more complicated if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken."  *Id*.  Here, Rickett was more than a "gofer or data gatherer" and exercised his own professional judgment in

22

preparing both the Original Report and the Supplemental Report based on information which Rickett alone perceived.  Stuart acknowledged that the observations contained in the Original Report regarding the trusses beneath each of the 16 residential buildings were not his observations but, instead, were Rickett's.  Stuart Dep. 187:14-188:11 [217-7].  Rickett, not Stuart, spoke to the manufacturer of the trusses.  *Id*. at 158:11-18.  Stuart would need to know what the manufacturer told Rickett regarding the trusses' allowable deflection, and Stuart claimed to have no opinion whether Waverly Apartments were required "to upgrade to code" under Bay St. Louis Ordinance 521, despite the fact that the Original Report opined that such an upgrade was required.  *Id*. at 163:7-165:11, 197:10-198:20, 199:11-200:20.

Stuart agreed that in order to independently verify the purported opinions in the Supplemental Report, Mississippi Farm Bureau would need information within Rickett's possession such as Rickett's field notes, drawings, and data.  *Id*. at 176:14-25. Most telling, Stuart was not familiar with each of the columns of data in the Supplemental Report, he realized for the first time during his deposition that one of the columns contained Rickett's measure of truss elevation when the column should have contained a measure of the unsupported length of each truss, and, according to Stuart, Mississippi Farm Bureau had no way of verifying the calculated deflection because Rickett did not include the unsupported length of the trusses in the Supplemental Report.[7]  *Id*. at 172:17-176:6.  This record makes clear that Rickett

---

[7] According to Stuart, a truss has "failed" when the truss's deflection "exceeds the allowable deflection" as provided by the manufacturer of the truss.  Stuart Dep. 197:10-198:6 [217-7].  The

was more than a mere gofer upon whom Stuart relied in formulating Stuart's

purported opinions.  *See also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d

558, 664 (S.D.N.Y. 2007) ("[E]xperts are permitted to rely on opinions of other

experts to the extent that they are of the type that would be reasonably relied upon

by other experts in the field.  But in doing so, the expert witness must in the end be

giving his own opinion.  He cannot simply be a conduit for the opinion of an

unproduced expert.").  Based on the foregoing, Stuart should be precluded from

testifying as an expert in this case.

> 2.     There is Too Great an Analytical Gap Between the Investigation
>        Performed by Rickett and Stuart's Conclusion as to Causation

In addition, Stuart should be excluded because there is too great an

analytical gap between the deflections in the trusses observed by Rickett and

Stuart's conclusion that the deflections were caused by flooding brought about by

Hurricane Isaac.  The Fifth Circuit has emphasized "the important test of analytical

'fit' between [an expert's] methodology . . . and the conclusions drawn" by the

expert.  *Johnson v. Arkema, Inc.*, 685 F.3d 452, 461 (5th Cir. 2012) (quoting *Rider v.*

*Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002)) (internal marks

omitted).  "[J]ust because a methodology is acceptable for some purposes, it may not

be acceptable for others, and a court may not admit evidence when there is simply

too great an analytical gap between the data and the opinion proffered."  *Id*.  Even

---

calculated deflection, therefore, is central to this case because it is the calculated deflection which
must be compared to the allowable amount of deflection.  *Id*. at 177:9-178:2.

Stuart acknowledges that the measurements obtained by Rickett during his December 19, 2012, inspection do nothing to identify a conclusion as to the cause of the deflections.  *See* Stuart Dep. 191:23-192:4 [217-7].  The Original Report offers only the conclusory statement that "[the] deflection occurred as a result of being saturated by flood[]waters while under load following Hurricane Isaac."  Original Report 2 [217-1].  The Original Report does not make any attempt to bridge the expansive gap between this conclusion and the actual cause of the deflection in the trusses measured by Rickett, and this gap renders Stuart's opinion inadmissible.[8] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting that "conclusions and methodology are not entirely distinct from one another" and that while "[t]rained experts commonly extrapolate from existing data[,]" district courts may find "that there is simply too great an analytical gap between the data and the opinion proffered").

Seahorn has not established that Stuart's opinion that the cause of the deflections Rickett observed at Waverly Apartments was anything more than Stuart's own *ipse dixit*, which is an insufficient basis upon which to predicate admissible expert opinion.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Black*, 171 F.3d at 313 (citing

---

[8] Because the Supplemental Report adds nothing further on the issue of causation, this outcome would be unaltered even if the Court were to consider the Supplemental Report at this point.

*Kumho Tire*, 119 S. Ct. at 1179).  In his Original Report, Stuart notes that inspection of the trusses beneath some of the buildings at Waverly Apartments "showed deflection in the trusses of approximately [two inches,]" and he makes the conclusory statement that "[t]his deflection occurred as a result of being saturated by flood[]waters while under load following Hurricane Isaac."  Original Report 2 [217-1].  In his Supplemental Report, Stuart produces a more detailed analysis of trusses in the 16 buildings at Waverly Apartments, but again states without further explanation "[t]he deflection in all trusses is related to the flood of the site caused by Hurricane Isaac."  Suppl. Report 3 [217-2].  In neither the Original Report nor the Supplemental Report does Stuart offer anything more than his own conclusory statements that the deflection Rickett observed was caused by Hurricane Isaac.

At bottom, the record makes clear that Stuart's proffered expert testimony in this case is unreliable.  The "reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it."  *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citations omitted).  Seahorn offers Stuart as an expert in the area of causation, in particular the cause of what Seahorn contends are deflected trusses which purportedly require reconstruction of each of the 16 residential buildings located at Waverly Apartments.  While both the Original Report and Supplemental Report may identify a problem, neither report sufficiently explains the method by which Stuart can reasonably or reliably conclude that the cause of that problem was flood water associated with Hurricane Isaac.  In view of

26

the record of this case and the purpose for which Seahorn seeks to use Stuart's opinions, those opinions are unreliable and must be excluded.

C.   Mississippi Farm Bureau's Motion to Exclude Testimony of Michael Gurtler Should be Granted in Part and Denied in Part

Seahorn appears to rely on Gurtler to offer expert testimony in the areas of the damage to the interior flooring of the residential units caused by moisture resulting from the flooding during Hurricane Isaac, and the cost to remediate the damages at Waverly Apartments.[9]   To the extent that Gurtler relies on Stuart's reports to offer opinions related to the replacement of the floor truss system in each of the residential buildings at Waverly Apartments, Gurtler must be precluded from offering such testimony.   "With respect to the admissibility of expert testimony, the district court is 'to ensure that an expert testimony rests upon a reliable foundation.'"   *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 561 (5th Cir. 2004) (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331-32 (5th Cir. 1996)).   The Court has excluded Stuart's Original Report and Supplemental Report, both of which purport to assign the cause of truss deflection observed at Waverly Apartments to the flood waters of Hurricane Isaac.   As a consequence of this

---

[9] Seahorn claims in opposition to Defendants' Motion to Exclude Testimony of Michael Gurtler [215] that Gurtler will offer expert opinion that Mississippi Farm Bureau's claim adjuster performed an inadequate inspection of flood damages at the Waverly Apartments, which prevented the adjuster from discovering damage to the floor framing system.   The Court finds that such an opinion is beyond the scope of Seahorn's Rule 26(a)(2) expert designation of Gurtler, and the Court will not allow Gurtler to testify beyond the scope of his designation.   *See, e.g., Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 247 (N.D. Tex. 2011) (refusing to allow expert to testify beyond the scope of his designation), *aff'd sub nom.*, *Powell v. Dallas Morning News, LP*, 486 F. App'x 469 (5th Cir. 2012).

finding, Gurtler lacks a reliable foundation upon which to offer opinions related to the alleged failure of the truss systems in each of the residential buildings because, even assuming those truss systems have failed, Gurtler has acknowledged that a determination of the impact of trusses being submerged in water is beyond the realm of his expertise.  Gurtler Dep. 302:10-13 [215-5].

Insofar as Gurtler relies upon visual inspection of the condition of the interior flooring of the first floor apartment units as support for any opinion that the failure of the truss systems is due to flooding caused by Hurricane Isaac, such an opinion is the product of speculation and conjecture.  *See* Stuart Dep. 194:4-6 [217-7] (agreeing that a "sight measurement" of the trusses would not comply with best engineering practices); 194:21-195:12 [217-7] (indicating that visual measurements of the trusses lack in accuracy).  Gurtler will be precluded from offering expert opinion related to damages Seahorn contends are the result of the purportedly failed truss systems beneath the residential buildings at Waverly Apartments.

With respect to the remaining areas in which it appears Seahorn seeks to have Gurtler offer expert testimony, the Court finds that the Motion [217] should be denied at this time because Mississippi Farm Bureau's objections in this regard go more to the weight of the evidence Seahorn seeks to offer as opposed to its admissibility.  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.*, 80 F.3d 1074,

1077 (5th Cir. 1996). Mississippi Farm Bureau's contention that "Gurtler's conclusion is supported by his data, at most, only 14 [percent] of the time" goes to the weight of Gurtler's proposed testimony rather than its admissibility. Mem. in Supp. of Mot. to Exclude Test. of Michael Gurtler 12-15 [216]. The same holds true for Mississippi Farm Bureau's objection to Gurtler's damages estimates, which objection is predicated on apparent discrepancies between Gurtler and Lyon's testimony regarding how the damages estimates were created. *Id.*; *see also Primrose Operating Co.*, 382 F.3d at 562 ("It is the role of the adversarial system, not the court, to highlight weak evidence."). The Motion [215] will be denied in part to the extent it seeks exclusion of Gurtler's opinions related to the cause and cost of damages to the interior flooring (as opposed to the trusses) at Waverly Apartments.

D.    Mississippi Farm Bureau's Motion to Exclude Testimony of Richard Lyon Should be Granted in Part and Denied in Part

Mississippi Farm Bureau does not appear to contest Lyon's qualifications to the extent he seeks to opine as to the cost of repairs allegedly sustained by Seahorn. *See* Rebuttal in Supp. of Mot. to Exclude Test. of Richard Lyon 3-6 [265]. Instead, Mississippi Farm Bureau contends that Lyon did not use his qualifications in this case. *Id.* Implicit throughout the Motion [219] is the claim that Lyon did nothing more than input disputed damages assessments supplied by Gurtler, and in doing so, did not employ the "intellectual rigor" characteristic of an expert in the field of adjusting and damages estimation. Mem. in Supp. of Mot. to Exclude Test. of Richard Lyon 5, 8-9 [220].

While Mississippi Farm Bureau contests the reliability of the damages assessments provided by Gurtler with respect to the interior flooring in each residential building at Waverly Apartments, the Court has found that Gurtler's opinions in that limited regard are sufficiently reliable and that Mississippi Farm Bureau's challenges go more to the weight of that evidence rather than its admissibility.  Because the Court at this stage is not concerned with the correctness of any opinion offered by Lyon, it is permissible for Lyon to rely on Gurtler's damages assessments on the flooring (but not the trusses), notwithstanding the disputed nature of those assessments as limited by this Order, in using the Xactimate computer software to arrive at a damages estimation.  *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also Arnold v. Canal Barge Co.*, No. Civ. A. 13-4966, 2014 WL 2465313, at *2 (E.D. La. June 2, 2014) ("[E]xperts may rely on one version of a disputed fact, and 'reliable expert testimony often involves estimation and reasonable inferences from a sometimes incomplete record.'") (quoting *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013)).  The Court finds that because the record supports the conclusion that the damages assessments related to the interior flooring in each of the residential units provided by Gurtler to Lyon are sufficiently reliable to pass *Daubert* scrutiny, the Motion [219] should be granted in part and denied in part.

30

III. <u>CONCLUSION</u>

**IT IS**, **THEREFORE**, **ORDERED AND ADJUDGED** that the Motion to Exclude Testimony of Frank Stuart [217] is **GRANTED**, and Frank Stuart is **EXCLUDED** from offering expert testimony or opinion in this civil action.

**IT IS**, **FURTHER**, **ORDERED AND ADJUDGED** that the Motion to Exclude Testimony of Michael Gurtler [215] is **GRANTED IN PART** and **DENIED IN PART**, such that Gurtler will be permitted to offer expert testimony and opinion limited to the damages allegedly caused by Hurricane Isaac to the interior flooring of each of the residential buildings at Waverly Apartments.

**IT IS**, **FURTHER**, **ORDERED AND ADJUDGED** that the Motion to Exclude Testimony of Richard Lyon [219] is **GRANTED IN PART** and **DENIED IN PART**, such that Lyon will be permitted to offer expert testimony and opinion limited to the estimated damages allegedly caused by Hurricane Isaac to the interior flooring of each of the residential buildings at Waverly Apartments.

**SO ORDERED AND ADJUDGED**, this the 10th day of September, 2015.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE